**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**UNITED STATES OF AMERICA,**

:

**Plaintiff,**

**v.**

**Case No. 2:25-cr-124(1)**
**Chief Judge Sarah D. Morrison**

**DEQUAN M. KEYS,**

:

**Defendant.**

**OPINION AND ORDER**

This matter is before the Court on Dequan Keys's Motion to Suppress Evidence (ECF No. 65). Mr. Keys moves to suppress all evidence obtained directly or indirectly from the traffic stop of the Ford Explorer he was driving. That Motion is ripe and, for the reasons below, it is **DENIED**.

## I. STATEMENT OF FACTS[1]

On January 25, 2025, Columbus, Ohio Division of Police ("CPD") Officer Kenneth Sanders responded to a reported shoplifting at a Family Dollar on West Broad Street. Officer Sanders spoke with the shoplifting suspect, Witness 1,[2] who

---

[1] The following factual background is based on the arrest report filed as Exhibit 1 to the Government's Response (Arrest Report, ECF No. 74-1) and the body camera footage manually filed by the Government. The Court cites to the footage using the same designations as the Government in its brief. All citations are an approximate reference to the starting time (as listed in the top right-hand corner) for the relevant portion of the footage cited.

[2] The Court refers to the individual who provided information to CPD about the robbery suspect using the same designation as the Government in its brief.

asked to speak with a detective about "a bunch of armed robberies." (03.2, 13:31–13:34.) Witness 1 told Officer Sanders that she knew "a guy who just robbed five places" and identified the stores, locations, and general timeframe of the robberies. (*Id.*; 03.1, 14:05–14:07; 04.2, 14:21–14:23.) She also stated that the most recent robbery occurred that morning at the Dollar General on West Broad Street, where the robbery suspect (who she described as a small-statured black male driving a newer model Ford Explorer) stole $300. (03.1, 14:07.) Officer Sanders indicated that he had heard about the robbery of the Dollar General, that her information was consistent with what he knew, and that he believed they were "talking about the same person." (*Id.*) She also told Officer Sanders that the robbery suspect had stolen three guns and was still carrying one of them. (*Id.*, 14:06–14:07.)

Before taking Witness 1 to jail, Officer Sanders accompanied her to leave her purse at a nearby house at 47 South Wayne Avenue. (*Id.*, 13:36). Witness 1 later told Officer Sanders that the robbery suspect was also staying at that house. (*Id.*, 14:08–14:09.) After booking, Witness 1 spoke further with a CPD detective about the robbery suspect. She provided another physical description of him (shorter black male in his thirties, approximately 150 lbs., wearing a gray coat, black pants, ski mask) and details about the robberies. (04.2, 14:28–14:29, 14:36–14:37.) When asked how she knew about the robberies, Witness 1 said that she was staying at the same house as him, he would talk about the robberies to her, and she was in the car during one of the robberies. (*Id.*, 14:23–14:25, 14:32.) She also told the detective that the robbery suspect drove a dark gray newer model Ford Explorer that he

parked on 47 South Wayne Avenue and that he "always has [a] loaded gun on him." (*Id.*, 14:28–14:37, 15:01.)

The next morning, Officer Sanders received information about a robbery at a Turkey Hill gas station at 8:11 a.m.; the suspect was a "black male, 5'05", 120 lbs, wearing a black mask with a Nike symbol" and he reportedly "fled in a newer Ford Expedition or Explorer, silver in color." (Arrest Report, PAGEID # 335; 02.1, 8:48–8:49.) After learning the details of the robbery, Officer Sanders and CPD Officer Joshua Kinzel stationed their patrol car near South Wayne Avenue to watch for the Ford Explorer. (*Id.*) When Officer Sanders spotted a silver Ford Explorer driven by a black male, he pursued the vehicle and radioed in what he believed to be the Explorer's license plate number (KIN 6896). (Arrest Report, PAGEID # 335; 02.1, 8:49–8:50.) He then radioed a sergeant, stating that he was tailing "that SVU" and it was "pulling up in front of 43 South Wayne Avenue." (*Id.*) Officer Sanders asked the sergeant if he should initiate a stop; the sergeant told him to stop the vehicle because it sounded like their "suspect." (*Id.*)

The Ford Explorer was parked near 47 South Wayne Avenue when the Officers approached it; they exited their patrol car with their firearms drawn and ordered the driver, Mr. Keys, out of the vehicle. (02.1, 8:50.) Meanwhile, Officer Kinzel radioed in to correct the vehicle's license plate number (KIN 6696). (*Id.*) Within 40 seconds, the dispatcher responded that the corrected license plate number belonged to a stolen vehicle. (*Id.*, 8:51.) Officer Sanders then told Mr. Keys, who was still in the Explorer, that they had "an issue with [his] plate[.]" (*Id.*) Mr.

Keys exited the vehicle after informing the Officers that he had a firearm on him. (*Id.*, 8:51–8:52.)

Officer Sanders handcuffed Mr. Keys while Officer Kinzel removed the firearm from Mr. Keys's waist. (*Id.*, 8:52.) Officer Sanders then told Officer Kinzel to "clear the vehicle." (*Id.*) Looking through the passenger-side window, Officer Kinzel saw a ski mask on the front seat. (*Id.*, 9:03; Arrest Report, PAGEID # 335.) After conducting a search on LEADS, Officer Kinzel learned that the firearm had also been reported stolen, and that Mr. Keys was driving under suspension and without a valid driver's license. (*Id.*) The Officers arrested Mr. Keys for driving under suspension, failure to display license plate, driving without a license, and aggravated robbery. (Arrest Report, PAGEID # 334.)

Mr. Keys was transported to CPD Headquarters to speak with robbery detectives before going to jail. (*Id.*) The Ford Explorer was towed to the CPD Impound Lot, where it was held until CPD obtained a search warrant. (*Id.*)

Mr. Keys now moves to suppress all evidence obtained during and as a result of the stop, including the firearm and ammunition; his statements; the items recovered from the Explorer during the stop; and "all subsequent searches, warrants, forensic examinations, statements, investigative leads, and other derivative evidence." (Mot., PAGEID # 285.)

## II. LEGAL STANDARD

The Fourth Amendment protects "the right of the people to be secure … against unreasonable searches and seizures[.]" U.S Const. amend. IV. A traffic stop is a "seizure" under the Fourth Amendment. *Heien v. North Carolina*, 574 U.S. 54,

60 (2014). Thus, Fourth Amendment protections apply when police officers make even brief investigatory stops of a vehicle. *United States v. Cortez*, 449 U.S. 411, 417 (1981). Also known as a *Terry* stop, an investigatory stop is permissible when the officer has a "reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." *United States v. Hensley*, 469 U.S. 221, 227 (1985). "In such circumstances, the officer may conduct a brief traffic stop for investigative purposes and make reasonable inquiries to confirm or dispel his suspicions." *United States v. Campbell*, 549 F.3d 364, 370 (6th Cir. 2008). The level of suspicion required for a *Terry* stop is less demanding than probable cause but requires "more than a police officer's hunch that criminal activity is afoot." *Srisavath v. City of Brentwood*, 243 F. App'x 909, 913 (6th Cir. 2007) (citation omitted). Courts reviewing a *Terry* stop consider whether, based on the totality of the circumstances, the officer had a "particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

To evaluate the constitutionality of a *Terry* stop, courts engage in a two-part analysis. First, was there a proper basis for the stop? *United States v. Beauchamp*, 659 F.3d 560, 569 (6th Cir. 2011) (citation omitted). Second, was the "degree of intrusion" "reasonably related in scope to the situation at hand," judged by the "reasonableness of the officials' conduct given their suspicions and the surrounding circumstances"? *Id*. (citation modified). Mr. Keys challenges the stop on both prongs.

## III. ANALYSIS[3]

### A. The Officers had reasonable suspicion to support a *Terry* stop.

Mr. Keys argues that the "generic robbery broadcast" describing a small-framed black male driving a newer silver Ford Explorer failed to create a particularized suspicion to support a *Terry* stop of the specific Ford Explorer or him. (Mot., PAGEID # 290.) This is so, he argues, because the broadcast did not include any distinctive facts about the vehicle or suspect to allow the Officers to distinguish the particular Ford Explorer or Mr. Keys "from the substantial number of vehicles and persons who could have matched the broad description." (*Id.*)

This argument is unavailing because the Officers stopped Mr. Keys based on more than just the broadcast's description.

Start with the information Witness 1 provided. Officers may rely on an informant's tip to support reasonable suspicion when the informant's identity is

---

[3] Mr. Keys requests an evidentiary hearing on his Motion, arguing that it is necessary to resolve factual issues concerning whether the Officers stopped the Ford Explorer due to an obstructed license plate and whether they had an objectively reasonable basis for doing so. (Mot., PAGEID # 293.) An evidentiary hearing on a motion to suppress is only required if the motion is "sufficiently definite, specific, detailed, and non-conjectural to enable to court to conclude that contested issues of fact going to the validity" of the stop are in question. *See United States v. Abboud*, 438 F.3d 554, 577 (6th Cir. 2006). An evidentiary hearing is unnecessary if the motion does not dispute any of the facts relating to the basis for the stop. *See United States v. Ickes*, 922 F.3d 708, 713 (6th Cir. 2019).

Mr. Keys has not identified a factual dispute that requires an evidentiary hearing. As discussed herein, the Officers had a reasonable, particularized suspicion that the Ford Explorer and the driver were connected to recent armed robberies. Thus, it is unnecessary to address whether the Officers also had a reasonable suspicion of a license-plate violation at the time of the stop. Mr. Keys's request for an evidentiary hearing is **DENIED.**

"easily ascertainable," she provides a basis for her knowledge, and her tip has "indicators of veracity." *United States v. Jackson*, 700 F. App'x 411, 414–15 (6th Cir. 2017) (citation modified). Here, Witness 1 (whose identity CPD confirmed during her arrest) provided details to Officer Sanders and others regarding the armed robbery suspect that were consistent with information already known to CPD. She also explained the basis for her knowledge – she was staying at the same house as the suspect, heard him talking about the robberies, and was in the car for one of them. Witness 1's statements regarding the armed robberies were sufficiently reliable and corroborated by CPD to allow Officer Sanders to reasonably rely on the other information she provided. From Witness 1, Officer Sanders learned that the suspect was a small-statured black male, lived at 47 South Wayne Avenue, and parked a newer-model Ford Explorer there.

Based on the witness's tip and the radio broadcast, Officer Sanders could reasonably believe that a small-statured black male driving a newer-model gray Ford Explorer near South Wayne Avenue was involved in that morning's armed robbery. *See United States v. Marxen*, 410 F.3d 329, 331 (6th Cir. 2005) (officer had reasonable suspicion to stop vehicle when "the police were reasonably certain of the make, model and general color" of the "getaway" car and were aware that the license number was "nearly identical" to the stopped vehicle). Additionally, the Officers saw the Ford Explorer near South Wayne Avenue consistent with the time

it would have taken to drive there from the location of the robbery.[4] (Arrest Report, PAGEID # 335); *see United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000) (reasonable suspicion for Terry stop where officer "observed a vehicle matching the description at a location consistent with the time needed to travel to that point" from the site of the burglary). These cumulative and specific facts provided a sufficient basis to stop the Ford Explorer to confirm whether the driver or the vehicle were involved in the robbery.

Under the totality of the circumstances, the Officers had a proper basis (a reasonable suspicion) to conduct a *Terry* stop of the Ford Explorer and Mr. Keys.

**B. The Officers did not exceed the scope of the *Terry* stop.**

Mr. Keys also challenges the scope of the Officers' response during the stop. Specifically, he argues that ordering him out of the Ford Explorer at gunpoint and handcuffing him was an "immediate and forceful seizure" not justified under the circumstances. (Mot., PAGEID # 291.)

A *Terry* stop "must not only be justified at its inception, but also 'must be reasonably related in scope to the circumstances which justified the interference in the first place.'" *Campbell*, 549 F.3d. at 372 (citation omitted). When conducting a *Terry* stop, police officers are permitted to take reasonable safety precautions,

---

[4] The robbery occurred at 8:11 a.m. at a gas station at 1953 Morse Road, approximately 15 miles and 35 minutes from 47 South Wayne Avenue at that time of day. *See* maps.google.com. Courts may take judicial notice of maps showing the distance and general time calculations between two locations. *See Livingston Christian Schs. v. Genoa Charter Twp*., 858 F.3d 996, 1008 (6th Cir. 2017) (citations omitted). The Officers observed the Ford Explorer near South Wayne Avenue at 8:50 a.m., roughly 39 minutes after the robbery suspect left the gas station.

"especially in situations involving suspected violent offenders." *United States v. Rogers*, 861 F. App'x 8, 14 (6th Cir. 2021). Such precautions do not exceed the bounds of a *Terry* stop as long as the circumstances warrant the precautions. *Houston v. Clark Cty. Sheriff Deputy John Does 1–5*, 174 F.3d 809, 815 (6th Cir. 1999) (collecting cases).

The Officers acted reasonably given their suspicions and the surrounding circumstances when they ordered Mr. Keys out of the vehicle with their guns drawn and handcuffed him. This was similar to a situation addressed by the Sixth Circuit in *United States v. Marxen*, 410 F.3d 326 (2005),

> Where, as here, officers have reason to believe a vehicle has been used in an armed robbery and that the subject robbers have not been apprehended, the officers may take reasonable precautions for their own protection. Such reasonable precautions include drawing and displaying weapons, the immediate removal of the occupants from the subject vehicle, and placing the occupants in handcuffs.

*Id*. at 332. When the Officers stopped Mr. Keys and the Ford Explorer, they believed that its driver had committed multiple armed robberies and had just committed another one. The Officers' precautionary measures did not exceed the permissible scope of the *Terry* stop under these circumstances.

### C. The Court does not address Mr. Keys's argument regarding the fruit of the poisonous tree.

Mr. Keys asks the Court to suppress all derivative evidence from the stop that was subsequently obtained through searches or warrants. (Mot., PAGEID ## 291–92.) Because the stop was lawful, the Court does not reach Mr. Keys's subsidiary argument regarding suppression of evidence obtained during and stemming from the seizure as fruit of the poisonous tree.

## IV. CONCLUSION

For the reasons set forth above, the Motion to Suppress (ECF No. 65) is **DENIED**.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**